**2024 UT App 68**

## THE UTAH COURT OF APPEALS

BRITTANY LEE ELDER,
Appellee,
*v.*
MATT BLAKE ELDER,
Appellant.

Opinion
No. 20210902-CA
Filed May 9, 2024

Second District Court, Farmington Department
The Honorable David M. Connors
No. 154700355

Julie J. Nelson and Jaclyn Robertson,
Attorneys for Appellant

Steven C. Tycksen, Attorney for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1     The district court issued an order requiring Matt Blake
Elder to reimburse his ex-wife, Brittany Lee Elder, for the amount
she had paid to satisfy a loan on a townhouse that she had been
awarded in the divorce.[1] Matt challenges this ruling on appeal,
arguing that it was a procedurally improper modification of the
couple's divorce decree. For the reasons set forth below, we
affirm.

---

1. Because the parties share a last name, we'll refer to them by
their first names moving forward, with no disrespect intended by
the apparent informality.

BACKGROUND

¶2 Brittany and Matt were married in 2008. In early 2015, Brittany filed a petition for divorce. Later that year, Brittany and Matt entered into a stipulated agreement that the district court subsequently adopted in a Decree of Divorce (the Decree). Under a "Division of Property" heading, the Decree divided the couple's real property, vehicles, and other personal property. Matt received the "marital home along with any accompanying debts and/or equity." Of note here, Brittany was awarded a townhouse "as an equalization of the distribution of the assets." The Decree specified that "Matt will be responsible for any loans associated with the townhouse and have them paid off within 120 days of signing this Stipulation."

¶3 A separate provision in the Decree was captioned "Remedies on Default." It stated that in "the event that either party defaults in her or his obligations, or must seek relief from the Court in the enforcement of the Decree of Divorce, the nonprevailing party shall be liable to the other party for all reasonable expenses, including attorneys' fees and court costs actually incurred."

¶4 Matt failed to remove the loan on the townhouse within 120 days. After that 120-day period expired, Brittany filed a motion for an order to show cause. In this motion, Brittany asked the court to hold Matt in contempt for failing to comply with several terms of the Decree—including, of note here, his obligation to pay off the loan associated with the townhouse. The district court later issued an order in which it refused to find Matt in contempt on the townhouse issue, but it did order Matt to "remove all liens on the townhouse" within 30 days. Matt failed to comply with this order.

¶5 In 2017, Matt filed for bankruptcy. Later that year, Brittany sold the townhouse. "[P]ursuant to a short sale agreement she

made with the bank," she paid off a discounted loan balance of $143,165.

¶6 In April 2019, Brittany filed another motion for an order to show cause relating to the townhouse. In this motion, Brittany requested a judgment in excess of $180,000, a figure that included the final loan balance, realtor's commissions, closing costs, and repairs that she alleged were necessary to make the townhouse habitable.

¶7 During a hearing in July 2020, the district court noted that a domestic relations commissioner had certified for hearing the issue of "the amount [Matt] should pay [Brittany] due to his failure to have the liens removed from the townhouse." At that point, Brittany's counsel expressed the desire to conduct discovery on the issue. In response, Matt's counsel suggested that she wasn't sure if discovery was warranted because there was "no petition to modify pending," after which she asked the court to "clarif[y]" whether it would "allow[] there to be discovery between the parties." The court responded that it was allowing "discovery" on "what amounts, if any," it should order Matt to pay Brittany for his "failure to have the liens removed from the townhouse," and the court specifically ruled that the parties could depose each other on this if they wished.

¶8 Brittany subsequently submitted interrogatories, a request for production of documents, and requests for admission to Matt. For his part, Matt issued several subpoenas duces tecum to financial institutions. At a pretrial hearing in November 2020, Brittany argued that Matt's responses to her requests for admission had been inadequate. Over the protest of Matt's counsel, the court agreed that Matt's responses had been inadequate and ordered Matt to submit more detailed responses. In the course of that hearing, Matt never argued that he was being deprived of the opportunity to conduct discovery of his own.

¶9 A few weeks later, the court held an evidentiary hearing on the question of "potential damages connected with the failure to deliver the title" to the townhouse "free and clear of liens." At that hearing, both parties presented extensive arguments about their positions.

¶10 After almost a year of additional litigation, the court issued a written ruling on Brittany's motion for an order to show cause. There, the court first noted that the provision in the Decree that made Matt "responsible" for any loans associated with the townhouse had "never been modified." The court also ruled that Matt's bankruptcy had not discharged his obligations relating to the townhouse.

¶11 The court then found that Matt had "failed to satisfy, pay off or remove the liens related to the loans associated with" the townhouse and that Matt's failure had "forced" Brittany to sell the townhouse in order to pay off the discounted loan balance. The court also found that the "actual amount paid by" Brittany to the bank "to remove the lien" on the townhouse "that was associated with the loan was $143,165.00." And it further found that the "required payment of this amount" by Brittany "was a direct result of [Matt's] failure to comply with the provisions of the Decree of Divorce." The court accordingly awarded Brittany "the actual amount she paid the bank, $143,165," plus post-judgment interest, though it then determined that she was not entitled to any additional amounts related to the renovation and sale of the townhouse. Finally, the court awarded Brittany her "reasonable expenses, including attorney fees and court costs actually incurred, related to the issue of [Matt's] failure to comply with his obligations" under the Decree.

ISSUE AND STANDARD OF REVIEW

¶12 Matt challenges the district court's ruling granting Brittany's motion for an order to show cause. In Matt's view, the

ruling was not a valid enforcement of the Decree but instead improperly modified it. "We review procedural issues for correctness and afford no deference to the lower court's ruling." *Berman v. Yarbrough*, 2011 UT 79, ¶ 12, 267 P.3d 905.[2]

ANALYSIS

¶13 Matt argues that when the district court ordered him to reimburse Brittany for what she had paid to satisfy the loan on the townhouse, the court modified the Decree. In Matt's view, because Brittany had only filed an enforcement action, not a modification action, this ruling was procedurally improper. We disagree with Matt's assessment of the nature of the ruling.

¶14 District courts enjoy "inherent" authority, "when properly invoked," to "enforce a final judgment." *Little Cottonwood Tanner Ditch Co. v. Sandy City*, 2016 UT 45, ¶¶ 23–24, 387 P.3d 978 (quotation simplified); *see also id.* ¶ 33 (explaining that district courts may "make such orders as may be necessary to carry out and give effect to their decrees" (quotation simplified)). "If a party fails to comply with a specific directive of a judgment, another party to the judgment may move to enforce this directive." *Id.* ¶ 24. However, a "court's power to enforce a judgment is confined to the four corners of the judgment itself." *PacifiCorp v. Cardon*, 2016 UT App 20, ¶ 6, 366 P.3d 1226 (quotation simplified). And a "motion to enforce cannot be used to take up matters beyond the contours of the judgment and thereby short-circuit the usual adjudicative processes." *Berman v. Yarbrough*, 2011 UT 79, ¶ 15,

_____

2. In his opening brief, Matt surmised that the district court's ruling might be read as a contempt ruling, and he then argued that the ruling was not justified under the court's contempt powers. In her responsive brief, Brittany declined to defend the ruling on this basis, instead insisting that it was a valid enforcement action. We accordingly address the ruling solely on those terms.

267 P.3d 905 (quotation simplified). A motion to enforce is thus "procedurally improper" where a judgment contains neither an "unequivocal mandate" nor a "clear directive" enjoining "the respondent to undertake some action." *Id*. (quotation simplified). This is so because, "without a directive or unequivocal mandate, there is nothing for the court to enforce." *Id*.[3]

¶15 Separate from the enforcement power, courts in some instances have power to modify a final judgment that has already been entered. And we've previously recognized that a key difference between the power to modify and the power to enforce is that the latter does "not generally extend to modifying the substantive rights of parties that have previously been agreed to

---

3. The rule in effect at the time that Brittany filed the motion at issue allowed her to file an order to show cause, and it further stated that such a motion could be granted for the "enforcement of an existing order." Utah R. Civ. P. 7(q) (2019). The cases we've discussed above referred to a court's enforcement power.

Under a rule that became effective in May 2021 and that remains in place, a motion for an order to show cause in a "domestic relations action[]" is now referred to as a "motion to enforce." *See* Utah R. Civ. P. 7B(a), (i), (j) (2023). (The same is true in civil cases more generally under rule 7A of the Utah Rules of Civil Procedure.) Rule 7B further provides that its process "replaces and supersedes the prior order to show cause procedure." *Id*. R. 7B(j). As with the old regime, however, the new one turns on the court's enforcement power. *See id.* R. 7B(a) (allowing a party to file a motion to "enforce a court order or to obtain a sanctions order for violation of an order").

Neither party in this case has argued that this new rule was intended to alter the substantive scope of a court's enforcement power, much less that the new rule did so in a manner that would change the outcome of this case. Having surveyed the matter ourselves, we see no authority suggesting that such a change was intended.

or adjudicated." *Robertson v. Stevens*, 2020 UT App 29, ¶ 8, 461 P.3d 323. In the family law context, "proceedings to modify a divorce decree . . . must be commenced by filing a petition to modify." Utah R. Civ. P. 106(a). And a petition to modify allows courts to "revisit many of the provisions contained in a typical divorce decree, including provisions pertaining to child custody, child support, alimony, property distribution, and debts," under the terms set forth by certain statutes. *Robertson*, 2020 UT App 29, ¶ 7.

¶16　Here, Brittany filed a motion for an order to show cause, which, as noted, was the procedural mechanism at the time for filing an enforcement action. But Brittany did not file a petition to modify the Decree. The question before us, then, is whether the district court moved beyond its enforcement powers when it ordered Matt to reimburse Brittany for what she had paid to satisfy the loan on the townhouse. Put differently, the question is whether this ruling was authorized from within "the four corners of the judgment," *Little Cottonwood*, 2016 UT 45, ¶ 24 (quotation simplified), or whether it instead "modif[ied] the substantive rights of [the] parties," *Robertson*, 2020 UT App 29, ¶ 8. In our view, this was indeed an enforcement ruling, as opposed to a modification, because it was grounded in the four corners of the Decree itself and did not alter the parties' substantive rights.

¶17　"We interpret a divorce decree according to established rules of contract interpretation." *Osborne v. Osborne*, 2011 UT App 150, ¶ 6, 260 P.3d 202 (quotation simplified). "When interpreting a contract, a court first looks to the contract's four corners to determine the parties' intentions, which are controlling." *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 16, 52 P.3d 1179. "If the language within the four corners of the contract is unambiguous, then a court does not resort to extrinsic evidence of the contract's meaning, and a court determines the parties' intentions from the plain meaning of the contractual language as a matter of law." *Id*. Finally, in "interpreting a contract, we determine what the parties

intended by examining the entire contract and all of its parts in relation to each other, giving an objective and reasonable construction to the contract as a whole." *G.G.A., Inc. v. Leventis*, 773 P.2d 841, 845 (Utah Ct. App. 1989).

¶18 The Decree in question stated that "Matt [would] be responsible for any loans associated with the townhouse and have them paid off within 120 days of signing this Stipulation." And it further explained that the townhouse was being awarded to Brittany "as an equalization of the distribution of the assets." In this sense, the Decree plainly contemplated that Brittany would receive the townhouse free and clear. But she didn't. As indicated, Matt failed to pay off the loan within 120 days. And when the court subsequently issued another order requiring Matt to remove the liens within an additional 30-day period, Matt failed to comply with that order too.

¶19 In the ruling at issue, the court found that Brittany was ultimately "forced to sell" the townhouse and "pay the discounted bank loan balance in the amount of $143,165," and it further found that the "required payment of this amount" by Brittany "was a direct result of [Matt's] failure to comply with the provisions of the Decree." Matt has not challenged these findings on appeal.

¶20 In light of these findings, the order requiring Matt to reimburse Brittany was a proper exercise of the court's enforcement power. The language of the Decree didn't narrowly require Matt to pay a particular amount to a particular bank. Rather, the provision in question was worded more broadly, requiring Matt to "*be responsible* for any loans associated with the townhouse" and requiring him to "have them paid off within 120 days." (Emphasis added.) As a result, when Brittany was subsequently "forced" to pay the loan off herself due to Matt's failure to comply with his obligations, the court's decision to place that financial burden back onto Matt's shoulders did nothing

more than "carry out and give effect" to the Decree's own terms. *Little Cottonwood*, 2016 UT 45, ¶ 33 (quotation simplified).

¶21    Matt responds on several fronts, but we find none of them availing.

¶22    First, Matt argues that under the principles set forth in *Gullickson v. Gullickson*, 2013 UT App 83, 301 P.3d 1011, the court's order could only have been accomplished through a modification action. We disagree. In *Gullickson*, the divorce decree had set forth a specific arrangement for how to deal with the marital home after the divorce: namely, the wife was permitted to live in it for a period of five years, during which period she was responsible for making the mortgage payments; at the end of the five years, the husband would be required to either buy out the wife's share of the equity in the home or instead sell it and give her half of the proceeds. *Id.* ¶ 2. Of some note, the arrangement under which the wife could remain in the home for five years was "prompted at least in significant part" by the "ongoing special needs" of the parties' son. *Id.* ¶ 22. When the wife subsequently faced a changed financial situation, however, she decided to move from the home earlier than planned. *Id.* ¶ 4. To facilitate this, she "filed a petition to modify the divorce decree," asking the court to require the husband to either buy her out sooner than was required by the decree (thus changing the time-period set forth in that decree), or to instead agree that she could move from the home and rent it out in order to help her pay the mortgage. *Id.* ¶ 4. The district court granted the wife's request and directed the husband to make that choice. *Id.* ¶¶ 6–7, 13.

¶23    On appeal, we considered various questions relating to whether the district court had properly followed the modification procedures. *Id.* ¶¶ 21–25. Drawing on aspects of that discussion, Matt now suggests that Brittany's request in this case could only have been brought as a modification petition. But unlike the wife in *Gullickson*, Brittany did not file a petition to modify her divorce

decree; rather, she filed a motion for an order to show cause, so she chose an entirely different procedural tack all along. Moreover, unlike the wife in *Gullickson*, Brittany did not ask the court to change any particular term of her divorce decree. Rather, when Brittany asked the court to order Matt to reimburse her for the pay-off amount on a loan that Matt was supposed to have paid from the beginning, Brittany was asking for Matt to be held "responsible" for that loan, which is what her divorce decree already required. Thus, *Gullickson* involved a modification because the order changed that divorce decree's terms; by contrast, this case involved an enforcement action because it sought to effectuate the divorce decree's terms. *Gullickson* therefore doesn't mean that Brittany could only proceed through a modification action.

¶24    Second, Matt argues that because the Decree required him to pay off any loans within 120 days, and because the amount at issue had been paid by Brittany much later than those 120 days, the court's order effectively changed the Decree's essential terms, thus constituting a modification. If the Decree had only said that Matt was required to pay off a particular loan to a particular bank within 120 days, Matt's argument might have a little more force (although we might still have some skepticism). But as noted, the Decree wasn't worded that narrowly. In addition to the language Matt relies on, the Decree said that "Matt *will be responsible* for any loans associated with the townhouse," and it further noted that Brittany was being awarded the townhouse "as an equalization of the distribution of the assets." (Emphasis added.)

¶25    As indicated, when reading contracts or divorce decrees, we interpret surrounding provisions in harmony with each other. The unmistakable intent of the Decree was to require Matt to assume the financial obligations associated with the townhouse. When Matt repeatedly failed to do so in a timely manner, the court had authority to "make such orders as may be necessary to carry out and give effect" to these provisions. *Little Cottonwood*, 2016 UT

45, ¶ 33 (quotation simplified). Since it's uncontested on appeal that Matt's failure to timely pay off the loan "forced" Brittany to sell the townhouse, the order in question placed the financial cost of that sale back onto Matt, thereby making him "responsible" for the loan, which is what the Decree always required.

¶26    Third, Matt complains of the alleged unfairness that resulted from the court treating this as an enforcement action, as opposed to requiring Brittany to proceed through a petition to modify. According to Matt, if this had been filed as a modification petition, the rules would have provided him with delineated discovery powers. In Matt's view, these discovery powers would have allowed him to obtain evidence to support various defenses, such as "whether Brittany could have (or even did) take mitigating action," whether Brittany received any benefit from living in the townhouse between the time of the Decree and when Brittany sold it, and whether "the marital estate was smaller than the parties thought when they stipulated to its division."

¶27    Matt's concerns seem grounded in the fact that, both before and after the 2021 amendments, the rules don't provide for formalized discovery relating to an enforcement action (whether filed as an old motion for an order to show cause or instead through a current motion to enforce). But the question of whether a party should automatically be entitled to discovery in an enforcement action is a question best left to those tasked with drafting the rules. Here, however, Brittany filed a motion for an order to show cause, and as explained above, that motion was warranted to enforce the terms of the Decree. We see no basis for overturning the district court's ruling simply because the rule drafters have not provided for automatic discovery in such cases.

¶28    In any event, even if it's possible that the absence of automatic discovery might result in some unfairness in some other enforcement action, Matt is not in a position to complain about any such unfairness here. As noted, the district court

specifically allowed the parties to conduct discovery—including taking depositions, if the parties desired—on "what amounts, if any," the court "should order [Matt] to pay [Brittany] due to the failure to have the liens removed from the townhouse." In reliance on that, Matt issued several subpoenas duces tecum to financial institutions. And Matt never argued below that he was being deprived of the opportunity to conduct any additional discovery.

¶29   Moreover, Matt also has not persuaded us that any of the proposed evidence would have constituted a valid defense to Brittany's request for relief. Under the Decree, Brittany was entitled to receive the townhouse without any loans as of 120 days after the stipulation was signed. Nothing in the Decree obligated her to take any mitigation efforts if Matt failed to comply with his obligations to pay off the loans, and any benefits that she received from living in the townhouse in the ensuing years were benefits that she was always entitled to receive. As for Matt's claim that the parties underestimated the marital estate's size, we note that Matt stipulated to the terms of the Decree. If he later thought that some error had infected that stipulation or the ensuing Decree, he could have made his own request to somehow alter or modify it. But what Matt wasn't entitled to do was simply not comply with its terms. And in the meantime, Brittany was entitled to ask the court to enforce the Decree as written, which is what she did.

¶30   In short, we conclude that the district court's order appropriately "carr[ied] out and [gave] effect to" the terms of the Decree. *Little Cottonwood*, 2016 UT 45, ¶ 33 (quotation simplified). Because of this, the district court did not err in granting Brittany's motion for an order to show cause.

¶31   As a final matter, Brittany has requested an award of attorney fees and costs that she incurred in this appeal, and she has done so pursuant to the same provision from the Decree that authorized the fee award she received below. That provision stated that in "the event that either party defaults in her or his

obligations, or must seek relief from the Court in the enforcement of the Decree of Divorce, the nonprevailing party shall be liable to the other party for all reasonable expenses, including attorneys' fees and court costs actually incurred."

¶32 "If the legal right to attorney fees is established by contract, Utah law clearly requires the court to apply the contractual attorney fee provision and to do so strictly in accordance with the contract's terms." *Vierig v. Therriault*, 2023 UT App 67, ¶ 13, 532 P.3d 568 (quotation simplified), *cert. denied*, 537 P.3d 1013 (Utah 2023). And as a general matter, "when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Tronson v. Eagar*, 2019 UT App 212, ¶ 39, 457 P.3d 407 (quotation simplified). Because Brittany has prevailed on appeal, she is entitled to her fees reasonably incurred on appeal. We therefore remand this case to the district court for determination of those fees and an entry of that award.

## CONCLUSION

¶33 The ruling in question was a valid exercise of the district court's power to enforce the Decree. As a result, we affirm the court's decision and remand for an award of attorney fees reasonably incurred on appeal.

———————